### TAYLOR et al. v. UNITED STATES.
### No. 6146.

Circuit Court of Appeals, Ninth Circuit.

Oct. 13, 1930.

Winter S. Martin, of Seattle, Wash., and Lewis & Church, of Port Angeles, Wash., for appellants.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash.

Before DIETRICH and WILBUR, Circuit Judges, and WEBSTER, District Judge.

WILBUR, Circuit Judge.

This action was brought by the government on behalf of the Quileute Indians, to enjoin the appellants from maintaining certain barges which are made fast to dolphins in the Quileute river off the Indian village La Push, upon the ground that said barges were located within the Quileute Indian Reservation and were being used for the purpose of trading with the Indians on the reservation in violation of the law. In support of that allegation, it was alleged that the Quileute river is a nonnavigable stream, but it was subsequently admitted by the government that the stream is navigable, and this admission accords with the fact as shown by the evidence. The appellants admit that they have in the past done some trading with Indians upon the reservation, but claim that they ceased to do so when objection thereto was made by the Indian agent at La Push. The question then is whether or not the bed of the navigable stream to which the appellants' barges are secured by the dolphin and over which they are anchored is a part of the Indian reservation. If so, it is conceded that the action can be maintained. So far as the barges of the appellants tend to obstruct a navigable stream, the appellants have secured the consent of the Secretary of War to the maintenance of the barges at the dolphins in the manner and at the place they are now used by the appellants. This action by the government is not based upon a claim of obstruction to navigation, but upon trespass upon the

Quileute Reservation. We will now consider whether the appellants' barges are within the boundaries of the reservation.

On February 19, 1889, President Cleveland made an executive order withdrawing from sale and settlement and setting apart for the permanent use and occupation for the Quileute Indians certain lands therein described according to government survey made in 1881, as follows:

"Lots 3, 4, 5 and 6, section 21; lots 10, 11 and 12, and the southwest quarter of the southwest quarter, section 22; fractional section 27, and lots 1, 2 and 3, section 38; all in township 28 north, of range 15 west, Territory of Washington."

■ This government survey, it is conceded, is in accordance with the law and custom where public lands adjoin navigable waters, and contains upland only; that is to say, the meander lines follow the high tide line along the shore. The boundary lines of the lots and sections mentioned, so far as they front upon navigable water, is the high tide line. St. Paul & P. R. Co. v. Schurmeier, 7 Wall. 272, 19 L. Ed. 74; Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872; Horne v. Smith, 159 U. S. 40, 15 S. Ct. 988, 40 L. Ed. 68. It is conceded that the grant of such lands by this description to private individuals would convey no rights below the high tide line. The question is whether, in setting apart these lots of land for the Quileute Indians, a different rule obtains, so that the United States government, as trustee for the Indians, retained title and jurisdiction over the bed of the Quileute river. The question is not free from difficulty, although similar questions have been frequently considered by the courts with relation to Indian reservations. In every case called to our attention the description of the lands reserved to the use of Indians either expressly included the body of water under consideration, or the description included land below the high-water mark, thus showing the intention to reserve lands for the Indians held in the sovereign right of the government for public purposes.

Before considering these decisions, we will state briefly the historical background upon which the presidential order of February 19, 1889, was based. In 1855–56 a treaty was entered into with several Indian tribes, among others the Quileute Indian Tribe. This treaty was subsequently ratified by the Senate of the United States. 12 Stat. 971; 2 Kappler, 719. In this treaty the Indian tribes contracting with the United States surrendered their rights to a large tract of land in Western Washington, the western boundary of which extended along the coast shore of the Pacific Ocean from the southwest corner of lands ceded by the Makah Tribe of Indians, to a point where the dividing ridge between the Chehalis and Quinaielt rivers reaches the shore line. The area ceded included the lands in question. Article 2 of this treaty provided that there should be reserved for the use and occupation of the Quileute and other Indians joining in the treaty, tracts of land sufficient for their wants within the territory of Washington to be selected by the President of the United States, "and hereafter surveyed or located and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent."

It is agreed that the tribes would remove and settle upon the reservations so provided within a year after ratification of treaty, or sooner, if the means were furnished them, and it is provided that in the meantime it shall be lawful for them to reside upon any lands not in the actual claim and occupation of any citizen of the United States, etc. Article 3 of the treaty reserves to the Indians the right of taking fish at all usual and accustomed grounds and stations in common with all the citizens of the territory, etc. Article 6 of the treaty provides that the President may remove the Indians from the reservations above referred to to other suitable places within the territory upon certain conditions which need not be considered.

It appears that until 1873 no formal action was taken by the President of the United States setting aside a reservation for these Indians in pursuance to the terms of the treaty, although the Commissioner of Indian Affairs did indicate certain areas to be occupied by the Indians, not including the reservation under consideration. In that year President Grant, by an executive order, set aside a large reservation of about 350 square miles for the Quileute and other Indian tribes. 1 Kappler, 923. This order purported on its face to be made under the terms of the above-mentioned treaty. Thereupon, under the treaty, it became the duty of the Quileute Indians to remove thereto. It may be assumed, although not so stated in the executive order of President Cleveland, that his order of February 19, 1889, was made to comply with the obligation placed upon him by the terms of the treaty with the Quileute Indians, and others. This presumption is based upon the obli-

gation resting upon the President under the treaty and upon the presumption of the regularity of official duty. In the report of the Secretary of the Interior to Congress February 18, 1910, a copy of which is set out in our opinion in U. S. v. Halbert, 38 F.(2d) 795, 798, it was said:

"To protect these Indians in their holdings off the reservation, executive orders of February 19, 1889, and April 12 and September 11, 1893, set aside and reserved approximately 1 square mile each for the Quileute, Ozette, and Hoh tribes, respectively. These small reservations are and have been occupied by the Indians in the form of villages and do not contain enough lands to provide allotments for all the Indians thereon."

■ In considering the relative rights of the Indians and of the state of Washington in the tidelands and navigable waters bordering the reservation, it should be observed that the government, by the treaty, recognized the rights of the Indians in the large area conceded by them to the United States government, and the government, in turn, recognized an inchoate right in the Indians in all the unclaimed and unoccupied lands of the tract ceded by them until reservations had been set aside for their exclusive use and occupation, to which they agreed to remove. This inchoate right to the larger area was to be focused upon the smaller and more definite area when that area was designated by the President of the United States. It is argued that Congress, since 1796 (R. S. § 2476, 43 USCA § 931), has recognized the trusteeship of the government of the United States in navigable rivers in territories of the United States for the people and for the states thereafter to be formed from such territory (1 Stat. 468, § 9, 2 Stat. 235, § 17, now Rev. Stat. § 2476, 43 USCA § 931; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331), and that this declaration had the effect of depriving the President of the United States of power to alienate such navigable rivers and the lands thereunder, and that therefore the executive order of the President setting aside the lands in question for the Quileute Indians could not convey to them or operate to retain in the United States for them the jurisdiction over the beds and shores of navigable streams. It must be conceded that the government of the United States could cede to an Indian tribe tideland and submerged land held by it by virtue of its sovereignty. Alaska Pacific Fisheries Co. v. U. S., 248 U. S. 78, 39 S. Ct. 40, 63 L. Ed. 138; Donnelly v. U. S., 228 U. S. 243, 264, 33 S. Ct. 449, 57 L. Ed. 820,

Ann. Cas. 1913E, 710; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331, supra. It is claimed, however, that this power resides in the Congress of the United States, and that the President's powers were necessarily limited by the above-mentioned acts of Congress. This contention, however, overlooks the fact that the treaty with the Indian tribes upon which the President's order was predicated is binding on the United States and that the President was acting in pursuance thereof. It is also claimed that in 1889 the President of the United States had no right to recognize an Indian nation or tribe as an independent nation, tribe, or power, by reason of the Act of Congress of March 3, 1871 (section 2079, R. S., 25 USCA § 71). This act, however, expressly provides that "no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired." Congress thus recognized the obligation to carry out the treaty of 1855–56 with the Quileute Indians, and this treaty provided that the President of the United States should set aside reservations for the Indian tribes joining in the treaty. These acts of Congress above referred to (R. S. §§ 2476 and 2079) furnish no obstacle to the inclusion in a reservation set aside in pursuance of this treaty of lands held by the federal government by virtue of its sovereignty which would otherwise have vested in the state of Washington under the Enabling Act (25 Stat. 676, § 4, subd. 2) and the Constitution of that state (article 17, § 1). The rights of Indians were expressly recognized by the Enabling Act (25 Stat. 676, § 4, subd. 2, supra) and by the Constitution of Washington (article 26). If, as we have said, the President of the United States in setting aside the reservation for the Quileute Indians at the mouth of the Quileute river was acting in pursuance of the treaty made by the government of the United States, with the Quileute Indians, it must be admitted, we think, that the executive order complying with a treaty made with a political body did set apart the reservation in question for the political body recognized in the treaty, namely, the Quileute Indian Tribe. The question then is whether the mere fact that the executive order setting aside the reservation did so for a political body and recognized treaty rights in that body determines that the description of upland contained in the executive order shall extend to the low tide line and thus include tidelands and the submerged bed of a navigable river. In other words, does the fact that the Indian tribe in question

had reserved to it the upland bordering upon a navigable stream and navigable waters by necessary implication reserve for their use the right in the adjoining navigable water, its tide and submerged land? In the decision of the Supreme Court of the state of Iowa in Haight v. City of Keokuk, 4 Iowa, 199, it was said arguendo (page 213):

"Had the grant been to them (half breed Indians) as a political society, it would have been a question of boundary between nations or states, and then the line would have been the medium filum aquae, as it is now between Iowa and Illinois. But such a grant could not be, without creating an imperiam imperio. This was not designed, and was not done. The grant was to them as individuals—as tenants in common—and is to be construed as any other grant or sale to individuals."

This excerpt from the opinion of that court was quoted with approval by the Supreme Court of the United States in Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224. The statement above referred to is dictum in both cases, for in each case the question under consideration was the effect of a grant to a private individual.

■■ In considering the effect of the decision of the Supreme Court of Iowa, Haight v. City of Keokuk, supra, and the quotation therefrom in the decision of the Supreme Court of the United States in Barney v. Keokuk, supra, it should be noticed that, in the treaty therein referred to with the Sock (or Sacs) and Fox Indians, 7 U. S. Stat. 229, the area set apart for the use of the half breeds belonging to the Sock and Fox Nations, the tract was described as "the small tract of land lying between the rivers Desmoin and the Mississippi, and the section of the above line between the Mississippi and Desmoin, is intended for the use of the half-breeds belonging to the Sock and Fox nations; they holding it, however, by the same title, and in the same manner, that other Indian titles are held." (Article 1) It will thus be seen that the land set aside is described as lying between two rivers which constitute the boundary lines of the land in question. It was held that, although bounded on the east by the Mississippi river, the reservation did not extend to the middle of the stream, for the reason that the grant to the half breeds was to them as tenants in common, whereas it is stated that, had the grant been to them as a political body, their title would have extended to the middle of the stream. After all, the question is one of intent to be determined from the terms of the instruments

under consideration in the light of the surrounding circumstances and the history leading up to the promulgation of the instrument. In the President's proclamation under consideration, the navigable waters surrounding and adjacent to the uplands described in the instrument are not referred to in any manner. That the reservation is bounded on the west by the Pacific Ocean and on the north by the Quileute river is not ascertainable except by reference to the government survey of 1881 which expressly delimits the upland. If we assume that, had the President described the land set apart as bounded by Quileute river and the Pacific Ocean, the federal government would have retained jurisdiction over the adjacent tide and submerged lands and navigable waters for the benefit of the Quileute Tribe, yet this, the President expressly refrained from doing. Unless the Indian tribes receive something in addition to the land delimited by the proclamation and the survey upon which it was based, their land did not include the navigable waters or lands thereunder held by virtue of its sovereignty. These lands and waters had already vested in the state by virtue of the reservation thereof by the United States for a public use, and the transfer thereof to the state by the Enabling Act and its acceptance by the state in its Constitution, subject to the discretionary power of the President under the treaty to reserve the same under the treaty. To hold that these tide and submerged lands were reserved for the Indians by the executive order of President Cleveland, we must not only infer from the mere circumstance that the Quileute Indians are a political body, that they are given a right in navigable waters and the lands thereunder, but also that it was the intent of the President to deprive the state of jurisdiction thereover and of title thereto. If we recognize the rule that in grants to Indians uncertainties are to be determined more favorably to them than to the government, we must here recognize that the governmental act is dual in its effect, if so construed, as it takes from the state a right already expressly granted to it and reserves it for a political body, not by express grant or reservation, but by mere implication. In other words, so construed, the act of the President extends to a political body, merely because it is a political body, a right which must be taken from another political body to which it has been already expressly granted. It would seem more reasonable that the previous express grant to a political body would take precedence over the implications which would otherwise arise from the reservation of the upland for an In-

dian tribe. We are inclined to think that the inferences to be derived from the fact that the Quileute Indians for whom the reservation was set apart are overcome by the prior express grant of the tidelands and navigable waters to the state. The decision of the Supreme Court in Donnelly v. United States, 228 U. S. 243, 259, 33 S. Ct. 449, 454, 57 L. Ed. 820, Ann. Cas. 1913E, 710, supra, as to the jurisdiction of the United States over the bed of the Klamath river under the order of President Harrison establishing the Hoopa Valley Reservation upon "a tract of country 1 mile in width on each side of the Klamath river," etc., was placed in large part upon the question of the ownership of the river bed by the United States at the time of the order. The court stated: "It seems to us clear that if the United States was the owner of the river bed, a reasonable construction of this language requires that the river be considered as included within the reservation."

Again it is stated: "The present question is whether that bed was a part of an Indian reservation, and that depends upon the question of ownership."

It was held that the state of California had transferred the ownership of the river bed to the United States as riparian owners, and that therefore the river bed, under the order establishing the reservation, was a part thereof. This case would be determinative of the case at bar were it not for the fact that the title of the state of Washington to the submerged lands now claimed to belong to the Quileute Indian Reservation was subject to the inchoate rights of the Indians. The decision, however, clearly shows the importance of a consideration of previously vested rights of a state in navigable streams in determining the effect of a subsequent order setting apart an Indian reservation. So considered, we hold that the order of President Cleveland of February 19, 1889, under consideration, did not reserve the submerged lands in question for their use.

In support of the contention that the grant of these uplands conveyed navigable waters and lands thereunder, the case of Alaska Pacific Fisheries v. U. S., 248 U. S. 78, 39 S. Ct. 40, 41, 63 L. Ed. 138, is cited by the appellee. In that case, "the principal question for decision is whether the reservation created by the Act of 1891 embraces only the upland of the islands or includes as well the adjacent waters and submerged land. The question is one of construction—of determining what Congress intended by the words 'the body of lands known as Annette Islands.'"

It was shown that the taking of salmon and other fish from the adjoining water was absolutely essential to the prosperity of the colony which was founded on the islands with the consent of Congress. It was said by the court:

"Evidently Congress intended to conform its action to their situation and needs. It did not reserve merely the site of their village, or the island on which they were dwelling, but the whole of what is known as Annette Islands, and referred to it as a single body of lands. This, as we think, shows that the geographical name was used, as is sometimes done, in a sense embracing the intervening and surrounding waters as well as the upland —in other words, as descriptive of the area comprising the islands."

It will be observed that this is a very different situation than that presented in the case at bar, where the rights of the Indians in the navigable waters of the Quileute river are based wholly upon an executive order describing the upland. The case of Winters v. U. S., 207 U. S. 564, 28 S. Ct. 207, 52 L. Ed. 340, deals with the Belknap Reservation in Montana. That case dealt with the rights of the Indians in the Milk river, the center line of which was designated as the northern boundary of the reservation. The Milk river was a nonnavigable stream. In view of these facts, the case furnishes no precedent for the question now under consideration. The decision of this court in United States v. Romaine, 255 F. 253, is cited by the appellee, but in that case the reservation was described in the executive order of November 22, 1873 (1 Kappler, p. 917; 12 Stat. L. 928), as "commencing at the eastern mouth of Lummi river; thence up said river to the point where," etc. Its northern line was described as "thence west along said township line to the low-water mark on the shore of the Gulf of Georgia; then southerly and easterly along the said shore, with the meanders thereof, across the western mouth of Lummi river and around Point Francis; thence north-easterly to the place of beginning, etc. By this description the lands above the low tide line were expressly included within the reservation. The court there said:

"The intention to reserve to the Indians the possession of the land to low-water mark is made evident by the terms of the proclamation, for one of the courses on the west side of the island runs 'to the low-water mark on the shore of the Gulf of Georgia, then southerly and easterly along the said shore with the

meanders thereof, across the western mouth of Lummi river, and around Point Francis.' "

There is nothing in the description of the land contained in President Cleveland's executive order which justifies an inference that it was the intention to reserve for the Indians lands below the high tide line or lands covered by the navigable waters adjoining the lands conveyed.

The record contains a good deal of evidence concerning the history of the Quileute river and the uses of that river for navigation and its importance as a harbor of refuge. We find nothing in this history to either force or justify the conclusion that the President intended in the executive order to include the adjoining navigable waters in the reservation. On the other hand, the continuous use of the river and harbor by the public for refuge and navigation would militate more strongly against that view than the history of the use thereof by the Indians would make for it. The use was a joint and continuous one by the public and by the Indians, a joint use opposed to the idea of exclusive rights in the Indians to the river and harbor. It appears from the evidence that the Quileute river is formed by the junction of two nonnavigable streams about four miles from the Pacific Coast, that the tide ebbs and flows in this river to the point of junction of these small and nonnavigable streams, but that the river is navigable along the boundary line of the reservation. A portion of the river in which the barges of the appellants are anchored has a history not unusual to streams along the northwest coast of the United States. Across the mouth of the Quileute river the tides and storms of the Pacific Ocean have built up a dike extending above high tide line. This dike, or barrier, is penetrated by the stream, and through this channel the tide ebbs and flows. Back of the barrier is a lagoon formed by waters flowing down the river and by the inflow of the tide. This lagoon is about a mile and a half in length. At the time of the government survey of 1881, the river had broken through at the extreme north end of this dike, and the mouth through which the river had theretofore flowed at the south end of the dike was closed by the storm which opened the dike at the north end. The lagoon, therefore, at the time of this survey, was entirely south of the thread of the stream, but later, by another storm, the northern entrance was closed, and the river broke through its old channel at the south end of the lagoon, so that the waters of the navigable river at the time of the trial flowed past the point where the barges of the appellants were anchored, which was near the southernmost end of the lagoon. The reservation includes the upland on both sides of the lagoon. It is immaterial to the consideration of the case whether the thread of the stream as existed at the time of the survey is taken or the present thread of the stream is considered, for in either event the point in question is within the reservation, if such reservation includes the waters under the navigable stream.

The evidence shows that the Indians used this lagoon and the adjacent waters of the Pacific in their fishing operations, some of which were conducted at sea and some in the Quileute river, and it is also shown that these waters were used by others in the transportation of lumber and supplies. The barges of the appellants are used largely for the purpose of trading with fishermen who fish for salmon far out at sea and come into the harbor to dispose of their fish and to secure gasoline and other supplies for the continuance of their operations. The evidence discloses no separate and exclusive use of these waters by the Indians. On the contrary, it shows a use by the Indians and by others entirely consistent with the theory on which the right of the state to navigable waters is sustained—that is, a public use to be exercised by any part of the public finding it convenient or necessary so to do.

We conclude that the title to the bed and the tidelands at the point in question are in the state of Washington, subject to the right of the United States to control navigation. The principal objection to the presence of the appellants' barges in the tidelands is the opportunity afforded to trade with the Indians. The bill of complaint is based upon the fact that the appellants had not secured the necessary license as to permit them to trade with the Indians. Appellants have denied that they have traded with the Indians on the reservation, and disclaim an intention so to do. We are not concerned with the question of the power of Congress to prevent or regulate trade with the Indian tribes (Constitution of the United States, art. 1, § 8, subsec. 3), but only the question as to what extent Congress has exercised that power. So far as applicable here, its prohibition has extended only to trading on the reservation, and, as we have seen, the appellants are not located on the reservation.

The decree will be reversed, and the trial court instructed to dismiss the action, each party to pay its own costs.

WEBSTER, District Judge, concurs.