**MONTANA POWER CO. v. ROCHESTER.**
**No. 9917.**

Circuit Court of Appeals, Ninth Circuit.
April 15, 1942.

J. E. Corette, Jr., of Butte, Mont., and Pope & Smith, Murphy, Garlington & Pauly, J. C. Garlington, and Russell E. Smith, all of Missoula, Mont., for appellant.

Lloyd I. Wallace, of Polson, Mont., Mulroney & Mulroney, of Missoula, Mont., and R. F. Gaines, of Butte, Mont., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The basic question here presented is whether a fee patent to allotted land bordering on Flathead Lake (a navigable lake), in the Flathead Indian Reservation, Montana, conveyed title to the low water mark of the lake, or to high water mark only.

Under a license issued by the Federal Power Commission and approved by the Secretary of the Interior, appellant constructed a dam in the outlet of Flathead Lake, the purpose of which was to develop water power and promote irrigation. Since the completion of the dam in 1938 the water of the lake has been maintained above its prior low water level. By the terms of the license the licensee was required to pay into the Treasury "as compensation for the use in connection with this license, of the Flathead Indian tribal lands" certain annual charges aggregating about

three million dollars, plus interest thereon.[1] The project specifically comprehended a reservoir in the river and lake.

Appellee owns a parcel of land comprising a little more than three acres, situated in the lake itself and joined to the shore by a narrow bar or isthmus. Her land, which is known as the "Armo Villa Site," had been surveyed and sold to appellee's grantor as surplus unallotted land of the Reservation pursuant to the provisions of the Act of April 23, 1904, 33 Stat. 302; and the patent to the same expressly reserved the right to flood all lands bordering the lake to a level of nine feet above the high water mark of the year 1909, for the purpose of irrigation or the development of water power. The reservation of the flood easement was pursuant to the Act of August 24, 1912, 37 Stat. 526. Since the completion of the dam, the lake level has at no time reached this elevation; in fact, it has not exceeded the ordinary high water mark, the effect of the dam being merely to prevent normal subsidence.

Appellee, at considerable expense, has established a summer home on her land. For the purpose of obtaining access to it she acquired an easement in a certain parcel, referred to as Lot 4, on the shore of the lake adjacent to the bar. The grant included a right of way over the isthmus, the grantors apparently assuming that the isthmus was a part of Lot 4. That lot had been conveyed by fee patent in 1920 to Benjamin Courville, a Flathead Indian; and appellee's alleged easement was acquired in 1932 from the grantees of Courville.[2] The patent to Courville contained no reservation of a right to flood.

By the terms of this easement appellee is given the right to pass over Lot 4 by vehicle in order to reach her home on the Villa Site. The bar connecting the Villa Site to the shore is about 1200 feet long and its lowest point is said to be about 240 feet from the Villa Site. The entire bar is and always has been below ordinary high water mark, but it was formerly feasible for vehicles to pass over it during the season of low water, or for a space of from seven and a half to nine months in each year. Since the erection of the dam, however, the entire bar has remained submerged for substantially the whole of each year so that the sole means of access to the Villa Site has been by boat. In the present suit appellee sought to recover damages caused by the act of appellant in thus continuously submerging the isthmus over which she claims the right of passage. The jury awarded her damages in the amount of $5,000; hence this appeal.

Appellee's theory, which the trial court adopted, is that Courville's patent to Lot 4 conveyed title to the low water mark of the lake; that the dividing line between Lot 4 and the Villa Site was the lowest point on the bar or isthmus (even though such point was above low water mark); and that appellee is entitled to recover the damage caused by the continuous flooding of the bar and the consequent loss of her easement. Appellant, on the other hand, contends that the Courville patent conveyed to the high water mark only, the land below that point and under the bed of the lake being held by the United States in trust for the Indians as a tribe. If appellant is right, neither Courville nor his grantees had title to the bar, hence could grant no easement over it; and appellee has therefore no right which has been invaded.

■ The Flathead Reservation was created by the treaty of July 16, 1855, negotiated with the confederated tribes of the Flathead, Kootenay, and Upper Pend d'Oreilles Indians, 12 Stat. 975. By the terms of Article II of the treaty there was reserved for the exclusive use and benefit of the tribes a large tract of land the northern boundary of which bisected Flathead Lake,[3] so that the whole of

---

[1] The Secretary of the Interior, whose consent to the project was expressly required by the Act of March 7, 1928, 45 Stat. 212, was of the view that the ownership of the lake and river beds was in the Indians, and this appears to have been a factor in fixing the compensation payable to the tribes. See Senate Document No. 153, pp. 40-42, 71st Congress, 2d Session.

[2] The grant of the easement was in settlement of a suit brought by appellee in the state court to establish her right of way.

[3] The area of the reservation was described as follows: "Commencing at the source of the main branch of the Jocko River; thence along the divide separating the waters flowing into the Bitter Root River from those flowing into the Jocko to a point on Clarke's Fork between the Camash and Horse prairies; thence northerly to, and along the divide bounding on the west the Flathead River,

the southerly half of the lake is within the confines of the Reservation.[4] In the briefs there is considerable discussion whether, prior to the treaty, title to these lands was vested in the United States subject only to the Indian right of occupancy, or whether the treaty merely confirmed in the Indians a title which they already had. Appellee strenuously urges the latter proposition; but we think the question is academic. Whether the ownership was originally in the Indians or in the United States, it is certain that by the treaty the United States undertook to hold title to the reserved area, including the bed of the southerly half of the lake, in trust for the confederated tribes. Obviously, prior to the treaty, title did not rest in any individual Indian, nor could the individual thereafter obtain title to any of the land except by patent from the United States. It was by such a patent that the Indian Courville got his title.

The question here is whether the United States continues to hold the land below the line of ordinary high water in trust for the tribes, or whether by virtue of the fee patents, or by force of state law—or the two combined—Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.,N.S., 107, the title vested in the allotees. Generally, as regards public lands abutting on navigable waters, in the territories, it has been thought that the title to the area below high water was held by the United States in trust for the states ultimately to be created, leaving it to the latter to determine what rights, if any, littoral proprietors have to the soil below high water mark.[5] The states have treated these shorelands in different ways, some of them, as for example, Oregon, Shively v. Bowlby, 152 U. S. 1, 14 S.Ct. 548, 38 L.Ed. 331, undertaking to hold or dispose of them in a proprietary capacity; while others, including Montana, Faucett v. Dewey Lumber Company, 82 Mont. 250, 266 P. 646, have regarded the riparian patentee as taking to low water mark. In the circumstances here we do not believe the question whether the Indian patentees took to low water, or only to high, is one of state law. Clearly, the United States in the exercise of its sovereign power had the right to deal with the lands below high water mark as it saw fit, Shively v. Bowlby, supra, Alaska Pacific Fisheries Company v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L. Ed. 138; Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann. Cas.1913E, 710; Taylor v. United States, 9 Cir., 44 F.2d 531, 533; and the treaty leaves no room for doubt that the government chose to hold the entire area, submerged lands no less than uplands, in trust for the Indians rather than for the future state to be carved out of the region.

Appellee insists, and it was the view of the trial court, that by force of the provisions of § 6 of the General Allotment Act,[6] Montana law governs; and that the Indian Courville must therefore be held to have title to low water mark in virtue of Faucett v. Dewey Lumber Company, supra, and the Montana statute and decisions generally. Section 6 of the Act, so far as pertinent, provides: "At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 [§ 5 of the original Act], then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory

to a point due west from the point half way in latitude between the northern and southern extremities of the 'Flathead Lake; thence on a due east course to the divide whence the Crow, the Prune, the So-ni-el-em and the Jocko Rivers' take their rise, and thence southerly along said divide to the place of beginning."

4 This is clear from the description of the Reservation. Cf. United States v. Romaine, 9 Cir., 255 F. 253. But even if the description were less clear, we would be obliged to construe the treaty as including the southerly half of the lake. Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Winters v.

United States, 207 U.S. 564, 577, 28 S. Ct. 207, 52 L.Ed. 340; United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213; Alaska Pacific Fisheries v. United States, 248 U. S. 78, 39 S.Ct. 40, 63 L.Ed. 138. The cases of Taylor v. United States, 9 Cir., 44 F.2d 531; United States v. Ashton, C.C., 170 F. 509, and Fish v. Wise, 10 Cir., 52 F.2d 544, are distinguishable.

5 43 U.S.C.A. § 931; Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; United States v. Pacheco, 2 Wall. 587, 17 L.Ed. 865.

6 Act of February 8, 1887, 24 Stat. 390, as amended, by Act of May 8, 1906, 34 Stat. 182, 25 U.S.C.A. § 349.

shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law." [7] Appellee's argument appears to be that since, upon the issuance of his patent, the Indian is to have the benefit of state law, the patent must be regarded as conveying title to low water mark.

We think the argument puts too great a strain on the statute. The obvious purpose of the provision is to define the status of the individual Indians in their relation to the state. Having been released from tutelage, the Indians are thereafter to be regarded as members of the community with the privileges and duties incident to citizenship. There is nothing in the language of the statute denoting an intent to enlarge the quantum of the allotments theretofore surveyed and held in trust. After the fee patent is issued the Indian has the same property he had before, the only material difference being that he now has the legal title, where during the period of the trust allotment he had the beneficial ownership only. See § 5 of the Act, 25 U.S.C.A. § 348. In this connection the Montana Enabling Act, Act of February 22, 1899, 25 Stat. 676, is significant. It provides that "until the title thereto [namely, the title to lands, held by any Indian or Indian tribe] shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." Section 4. See United States v. Romaine, 9 Cir., 255 F. 253, 260; United States v. McIntire, 9 Cir., 101 F.2d 650, 654. So far as we are advised, the beneficial ownership of the Indians in the bed and shores of the lake has not been extinguished by the government.

It is inadmissible to suppose that the United States, having agreed to hold this area in trust for the exclusive use and benefit of the Indian tribes, intended to put the tribes at the mercy of the future state, the policy of which was necessarily unknown at the time of the treaty, or, for that matter, at the time of the passage of the General Allotment Act; for by adoption of a proprietary policy the state might substantially interfere with, if not foreclose, use of the shores by the Indians in the conduct of their fishing operations. There is, in short, nothing either in the treaty itself or in its setting, or in subsequent legislation, suggestive of an intent that the ownership of lands in the Reservation below the line of ordinary high water was to be at the disposal of the state.

It remains to inquire whether, independently of these considerations, the fee patents to allotted lands in this Reservation ought to be construed as granting title to low water. The Courville patent is in the usual form, merely conveying title to "Lot 4 of section 25" and the east half of the northwest quarter of an adjoining section, the whole of which is described as containing 110.46 acres. The general rule, of course, is that patents of the United States to lands bordering navigable waters, in the absence of special circumstances, convey only to high water mark. The rule has its roots in the principle of the common law that ownership of the shore, comprising the area between high and low water, should be in the sovereign in trust for the general weal. See Martin v. Waddell's Lessee, 16 Pet. 367, 10 L.Ed. 997; Shively v. Bowlby, supra. No special circumstances have been called to our attention from which it might be inferred that a different rule ought to be applied here.[8] Such circumstances as there are point in the contrary direction. The Indian society is communal in character rather than individualistic; and this is particularly true in respect of the hunting and fishing grounds of the Indians. The right of the Flathead tribes to take fish in the waters within or bordering on the Reservation is carefully

---

[7] As contained in § 6 of the original Act, this provision read as follows: "Upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law."

[8] In United States v. Boynton, 9 Cir., 53 F.2d 297, 298, involving lands in the Lummi Reservation, it was conceded that the allottee took only to the high water mark, and that "the purpose when the allotments were made was to reserve for the common use of the tribe the land over which the tides flowed."

defined and safeguarded in Article III of the treaty.

We conclude, therefore, that the patent to Courville conveyed title to high water mark only, and that title to land below that mark and beneath the lake is in the United States in trust for the confederated tribes. It follows that appellee had no right which has been invaded.

Reversed.