No. 00-762

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 85

IN THE MATTER OF:

THE ESTATE OF ANTOINETTE
HOBBS, DECEASED.

APPEAL FROM:     District Court of the Twentieth Judicial District,
                 In and for the County of Lake,
                 The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

          Kathleen O'Rourke Mullins, Manley & O'Rourke Mullins, Polson, Montana

      For Respondent:

          John A. Mercer, French, Mercer, Grainey & O'Neill, Polson, Montana

      For Amicus:

          John B. Carter, Daniel F. Decker, Confederated Salish & Kootenai Tribes,
          Pablo, Montana

Submitted on Briefs:  February 16, 2001

Decided:  May 2, 2002

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Tamera and Stanley Conrad, two of the heirs of Antoinette C. Hobbs, appeal an order of the District Court for the Twentieth Judicial District, Lake County, approving a corrected certificate of survey and transferring land between the high water mark and the meander line of Flathead Lake to three of the other heirs of Antoinette's estate.  We reverse.

¶2     The Conrads raise the following issues on appeal:

¶3     1.  Did the District Court err in approving a corrected certificate of survey and in allowing additional land between the high water mark and the meander line of Flathead Lake to be transferred to the heirs of the estate?

¶4     2.  Did the District Court err in proceeding with a hearing in this matter without the presence of an indispensable party to the proceedings?

¶5     Because we hold that Issue 1 is dispositive, we do not address Issue 2.

**Factual and Procedural Background**

¶6     Antoinette died on August 24, 1998.  At the time of her death, Antoinette owned property on the shore of Flathead Lake located within the Flathead Indian Reservation and more particularly described in a codicil to her Last Will and Testament as portions of Lot 1, Section 32 and Lot 3, Section 33, Township 23 North, Range 19 West, P.M.M., Lake County, Montana.  Antoinette left this property to four of her nieces, Susan Westcott, Carol Julian, Marcia Beckman and Tamera Conrad, and to Tamera's husband, Stanley Conrad.  The codicil to Antoinette's will directed that the property be divided and a common boundary agreed upon by the heirs so that Westcott, Julian and Beckman would take the south half of the property "and that portion above the high water shall be exactly 1 acre."  The Conrads

2

were to receive the remaining portion of land from the high water mark of the lake inland (approximately 1.19 acres) including Antoinette's home and shop.

¶7 During the administration of Antoinette's estate, Julian, as personal representative, directed that a survey be conducted to show the division of the property and to establish the boundaries of the two resulting lots. This survey did not include any land lying between the high water mark and the meander line of Flathead Lake. The survey was approved by the District Court, the property was distributed, and Antoinette's estate was closed in February 2000.

¶8 Thereafter, the heirs became involved in a separate dispute over zoning regulations and building restrictions. The issues raised in that dispute caused Julian, as personal representative of Antoinette's estate, to petition the District Court to reopen the estate for the purpose of filing a corrected certificate of survey and to transfer that portion of the land lying between the high water mark and the meander line of Flathead Lake to the heirs thereby increasing the acreage of both lots. Julian supported her petition with exhibits and affidavits which verified that Antoinette had paid taxes on the land out to the meander line.

¶9 At the hearing in this matter, the Conrads raised objections to the petition on the grounds that Antoinette's will left only one acre above the high water mark to Julian, Westcott and Beckman and, more importantly, that the estate did not own the land between the high water mark and the meander line of the lake, thus it could not convey that land to anyone. Nevertheless, on August 30, 2000, the court approved the corrected survey and

3

ordered the transfer of the land lying between the high water mark and the meander line of the lake to the heirs.  It is from this order that the Conrads appeal.

¶10     The Confederated Salish and Kootenai Tribes (the Tribes) appear in this action as amicus curiae and have filed a brief contesting the District Court's jurisdiction to adjudicate the ownership of the bed of Flathead Lake within the Flathead Indian Reservation.

### Discussion

¶11     *Did the District Court err in approving a corrected certificate of survey and in allowing additional land between the high water mark and the meander line of Flathead Lake to be transferred to the heirs of the estate?*

¶12     The Conrads argue that the District Court erred in approving the corrected certificate of survey and in allowing additional land lying between the high water mark and the meander line of Flathead Lake to be transferred to Antoinette's heirs because Antoinette did not own that land, thus she could not transfer it to her heirs.  The Conrads maintain that this land is owned by the United States in trust for the Tribes.  In like manner, the Tribes argue that the District Court lacked personal and subject matter jurisdiction, consequently, the court should have dismissed that portion of Julian's claims pertaining to the ownership of the bed of Flathead Lake below the high water mark.

¶13     In 1956, Antoinette and her husband, Ronald V. Hobbs, purchased 9.49 acres from Richard and Faye Burland.  The Burlands received this land in 1955 through a grant from the United States Department of the Interior, Bureau of Land Management.  The total acreage granted was 45.22 acres.  The present action involves approximately one acre of land

4

stretching from the high water mark of the property devised to Westcott, Julian, Beckman and the Conrads out to the meander line of Flathead Lake.

¶14 The Flathead Reservation was created by the Treaty of Hell Gate on July 16, 1855. The treaty was negotiated with the confederated tribes of the Flathead, Kootenai, and Upper Pend d'Oreilles Indians. Article II of the treaty reserved for the exclusive use and benefit of the tribes a large tract of land the northern boundary of which bisected Flathead Lake so that the whole of the southern half of the lake is within the confines of the Reservation. The property in dispute is on the southern shore of Flathead Lake and thus it is within the boundaries of the Reservation.

¶15 Sixty years ago, in *Montana Power Co. v. Rochester* (9th Cir. 1942), 127 F.2d 189, the Ninth Circuit Court of Appeals settled the question of ownership of the bed of Flathead Lake within the Reservation. There, the court stated that the Treaty of Hell Gate "leaves no room for doubt that the government chose to hold the entire area, submerged lands no less than uplands, in trust for the Indians rather than for the future state to be carved out of the region." *Rochester*, 127 F.2d at 191.

¶16 In *Rochester*, the plaintiff brought an action against the Montana Power Company (MPC) for damages caused by the continual flooding of an isthmus over which plaintiff claimed a right of passage. MPC had constructed a dam in the outlet of Flathead Lake in 1938 for the purpose of developing water power and promoting irrigation. After the completion of the dam, the water of the lake was maintained above its prior low water level thereby preventing the plaintiff from accessing her summer home. This home was situated

5

on three acres within the lake itself and joined to the shore by a narrow bar or isthmus over which the plaintiff had acquired a right of way. The plaintiff's theory was that the individual from whom she had acquired the right of way owned the land out to the low water mark of the lake, thus plaintiff was entitled to recover damages caused by the continual flooding of the isthmus and the consequent loss of her easement. *Rochester*, 127 F.2d at 189-90.

¶17 According to the *Rochester* court, the general rule is that patents of the United States to lands bordering navigable waters convey only to the high water mark absent special circumstances. The court found no special circumstances in this case. It did find, however, that the right of the Tribes to take fish in the waters within or bordering on the Reservation "is carefully defined and safeguarded" in Article III of the Treaty of Hell Gate. Hence, the court held that the patent of the plaintiff's predecessor conveyed title to the high water mark only, and that title to land below that mark and beneath the lake is in the United States in trust for the Tribes. *Rochester*, 127 F.2d at 192-93

¶18 Forty years later, in *Confederated Salish & Kootenai Tribes v. Namen* (9th Cir. 1982), 665 F.2d 951, *cert. denied*, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982), the Ninth Circuit Court of Appeals reaffirmed its holding in *Rochester*. In *Namen*, the Tribes sued the Namen family, owners of Jim's Marina in Polson, for trespassing on Tribal property by building docks and improvements on Flathead Lake below the high water mark. *Namen*, 665 F.2d at 953-54. After an exhaustive analysis of the Treaty of Hell Gate, post-Treaty legislation, and Executive branch actions, the *Namen* court determined that the Namen family's title extended only to the high water mark and that the bed and banks of Flathead

6

Lake within the Reservation boundaries are held by the United States in trust for the Tribes. *Namen*, 665 F.2d at 962.

¶19    Indeed, the determination that the bed of the south half of Flathead Lake is held in trust for the Tribes by the United States has been upheld in every federal challenge. *See, for example, Montana Power Co. v. Federal Power Com.* (D.C. Cir. 1972), 459 F.2d 863, 865, *cert. denied*, 408 U.S. 930, 92 S.Ct. 2497, 33 L.Ed.2d 343 ("The Tribes also own one half of the land of the reservoir, known as Flathead Lake."); *United States v. Pollmann* (D. Mont. 1973), 364 F. Supp. 995 (holding that federal and Tribal prohibitions on hunting and fishing on the south half of the Lake apply because under *Rochester*, the United States owns it in trust for the Tribes); *Confederated Salish & Kootenai Tribes v. Montana* (D. Mont. 1990), 750 F. Supp. 446 (holding that the Tribes are the beneficial owners of the south half of Flathead Lake and that Tribal ownership encompasses the lake bed to the high water mark).

¶20    Consequently, the Conrads and the Tribes correctly argue that Antoinette's predecessors, the Burlands, received only that land extending from the high water mark inland. That is all they could have conveyed to Antoinette and that is all Antoinette could devise to her heirs.

¶21    Notwithstanding, Julian argues that title to the disputed property was not affected by the District Court's Order of August 30, 2000, because in Montana, a district court sitting in probate does not determine title and simply passes that land owned by the decedent to the heirs. That, however, is precisely the point. The probate court can only pass land *owned* by the decedent to the heirs. Antoinette did not own the land from the high water mark to the

7

meander line of Flathead Lake.  That land is vested in the United States and held in trust for the Tribes.

¶22    In addition, contrary to Julian's assertions that she did not request that the probate court determine title to the property, her counsel argued at the August 30, 2000 hearing that Julian was

> seeking to open the estate so that we can extend the property to the same boundary line as the zoning district, because the zoning requires that lots be one and a half acres in size within the zoning district in order to comply to allow for construction of the property.

In addition, counsel stated:

> We're just asking the Court to allow the Personal Representative to be reappointed so she can transfer all rights, title and interest, whatever that might be, to the heirs of the estate by simply extending . . . out that land between the meander line and the high water mark and add it to each of those two lots . . . .

Thus, it is clear that Julian's petition to reopen the estate was for the sole purpose of extending her title to include the bed of Flathead Lake between the high water mark and the meander line.

¶23    However, as we have already determined, Antoinette could not and did not own the land between the high water mark and the meander line of the lake, because her predecessors, the Burlands, did not own it by conveyance in their patent of record or at law.  Antoinette never received this land because the Burlands never had it to give, thus Antoinette could not

8

in turn devise this land to her heirs.  Title of the property still rests in the United States in trust for the Tribes.

¶24     Under Montana law, because title of the property rests in the United States in trust for the Tribes, the District Court was without jurisdiction to distribute the property to the heirs of Antoinette's estate.

> **Rights, privileges, and immunities reserved to Indians.**  Nothing in this part shall:
> (1)  authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States;
> . . . .
> (3)  confer jurisdiction upon the state of Montana to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein; . . .

Section 2-1-304, MCA.

¶25     Not only has the State of Montana disclaimed jurisdiction over Indian lands, but the federal government has assumed a preemptive role in all matters involving Indian lands and Indian issues in general.  *See* Title 25 of the United States Code.  Furthermore, Congress has placed federal restrictions on the alienation of Indian lands.  It does so under the federal fiduciary relationship to Indians and Indian resources.  Thus, when it legislates over Indian lands, it is continuing its guardianship over these lands, and

> [d]uring the continuance of this guardianship, the right and duty of the [United States] to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid. . . .
> . . . A transfer of the [Indian land] is not simply a violation of the proprietary rights of the Indian.  It violates the governmental rights of the United States. . . .

9

*Heckman v. United States* (1912), 224 U.S. 413, 437-38, 32 S.Ct. 424, 431-32, 56 L.Ed. 820.

¶26    Moreover, federal court jurisdiction over disputes involving Indian lands is specified in 28 U.S.C. § 1362.  It vests the federal district courts with "original jurisdiction of all civil actions, brought by an Indian tribe . . . wherein the matter in controversy arises under the Constitution, laws or treaties of the United States."  Additionally, 28 U.S.C. § 1362 formed the basis for federal jurisdiction over the Indian land dispute in *Oneida Indian Nation v. County of Oneida* (1974), 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73.  There the United States Supreme Court explained that

> [t]he rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13 . . . .  But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law.

*Oneida*, 414 U.S. at 670, 94 S.Ct. at 778-79.

¶27    In summary, § 2-1-304, MCA,  and the federal laws and cases cited above make clear that the District Court was specifically precluded from assuming jurisdiction over that portion of the estate purporting to vest title to the land lying between the high water mark and the meander line of Flathead Lake to the heirs of Antoinette's estate.

¶28    Accordingly, we reverse the District Court's August 30, 2000 order granting Julian's request to reopen probate of the estate, with instructions to vacate the court's August 30, 2000 decree of distribution and reinstate the court's June 30, 1999 decree of distribution.

¶29    Reversed.

                                                        /S/ JAMES C. NELSON

We Concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER