UNITED STATES of America,
Plaintiff,

v.

Harlan Frank POLLMANN,
Defendant.

Crim. No. 4472.

United States District Court,
D. Montana,
Missoula Division.

Aug. 29, 1973.

Otis L. Packwood, U. S. Atty., Billings, Mont., for plaintiff.

Boone, Karlberg & Haddon, Missoula, Mont., and Turnage & McNeil, Polson, Mont., for defendant.

Confederated Salish and Kootenai Tribes of the Flathead Reservation, represented by Richard A. Baenen, Washington, D. C. (Wilkinson, Cragun & Barker, Washington, D. C., of counsel), for amicus curiae.

## ORDER AND MEMORANDUM OPINION

JAMESON, District Judge.

The information charges that the defendant, Harlan Frank Pollmann, "did without lawful authority or permission, willfully and knowingly go upon land * * * a portion of Flathead Lake * * * belonging to the Confederated Salish and Kootenai Indian Tribes, for the purpose of fishing thereon, contrary to the provision of 18 U.S.C., Section 1165."[1] The defendant filed a motion to dismiss, attacking the sufficiency of the information and the constitutionality of 18 U.S.C. § 1165, and contending that the Tribes have no right to regulate the use of navigable waters and that the prosecution is in violation of the Civil Rights Act of 1968 and constitutes racial discrimination against a non-Indian. This motion was denied in order entered March 16, 1973.

Thereafter defendant filed a supplemental motion to dismiss on the ground that Tribal Ordinance 44A (Revised) of the Confederated Salish and Kootenai Tribal Council[2] is invalid as it purports to apply to the south half of Flathead Lake and to this defendant and as a basis for charging defendant with a violation of 18 U.S.C. § 1165. Without waiving any rights under either of his motions, defendant agreed with plaintiff to submit the controversy to the court for its decision on an agreed statement of facts.[3]

### Agreed Facts[4]

On June 1, 1972 the defendant, a non-Indian, was fishing from a boat on the surface of the waters of the south half of Flathead Lake within the exterior boundaries of the Flathead Indian Reservation. He had in his possession a valid Montana fishing license, but no recreation permit from the Confederated Salish and Kootenai Tribes. He had regularly fished the waters of the south half of Flathead Lake for 36 years without any express authorization or denial of permission by the Tribes or the United States.

1. 18 U.S.C. § 1165 provides:
   "Hunting, trapping, or fishing on Indian land
   "*Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe*, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, *for the purpose of* hunting, trapping, or *fishing thereon*, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited." Pub.L. 86–634, § 2, July 12, 1960, 74 Stat. 469. (Emphasis added)

2. Tribal Ordinance 44A (Revised) was adopted by the Tribal Council on February 14, 1969. Section 6 provides:

"No non-members shall use tribal trust Indian lands or the waters of the Flathead Indian Reservation for purposes of fishing, hunting, camping, boating, snowmobiling, and related outdoor recreation activities without a valid recreation permit in his possession, which shall be displayed upon request of any duly authorized person."

3. Both parties and the Tribes, as amicus curiae, have filed well prepared and comprehensive briefs on both motions and the agreed statement of facts. This opinion will repeat in part the contents of the order of March 16, 1973, as well as consider the issues raised by the supplemental motion and agreed statement.

4. The truth of all facts in the agreed statement is admitted by both parties, but the question of relevancy was reserved.

The defendant was aware that the Tribes had stated that recreational permits would be required for reservation waters under Tribal Ordinance 44A. He was aware also that 18 U.S.C. § 1165 provides in part that it is unlawful to go upon any land belonging to an Indian tribe for the purpose of fishing, but was not aware that his fishing from a boat on the surface waters of the south half of Flathead Lake was a trespass upon Indian lands. He believed that these waters were not "land" within the meaning of § 1165.

The defendant was aware that Article 3 of the Hellgate Treaty granted to the Confederated Tribes the exclusive right of taking fish from streams running through the Flathead Reservation [5] but believed the lake waters were not a stream and were not waters to which the Tribes held an exclusive fishing right.[6]

*Ownership of South Half of Flathead Lake*

Under the Treaty of Hellgate the southern half of Flathead Lake (the area described in the information) is within the exterior boundaries of the Flathead Indian Reservation. In Montana Power Co. v. Rochester, 127 F.2d 189, 191 (1942) the Court of Appeals for the Ninth Circuit held: "Whether the ownership was originally in the Indians or in the United States, it is certain that by the treaty [the Hellgate Treaty] the United States undertook to hold title to the reserved area, including the bed of the southerly half of the lake [Flathead Lake], in trust for the confederated tribes."

*Rochester* has been followed by this and other courts in subsequent decisions.[7] Defendant argues, however, that while the south half of Flathead Lake is within the exterior boundaries of the Flathead Indian Reservation, it is not a part of the reservation and that *Rochester* was in error in holding that the tribes are the owners of the bed of the lake.

It is true, as defendant contends, that the United States is deemed to have held title to submerged lands below navigable waters in trust for the future states in which the water lay, unless the Congress expressly granted title to another. Shively v. Bowlby, 152 U.S. 1, 48–49, 14 S.Ct. 548, 38 L.Ed. 331 (1894). On the other hand, it is also well settled that Congress has the power to include ownership of the beds of navigable waters as a part of an Indian reservation, United States v. Romaine, 255 F. 253, 259 (9 Cir. 1919) relying upon Shively v. Bowlby, *supra*; Organized Village of Kake v. Egan, 174 F.Supp. 500, 503 (D. Alaska 1959); and that whether or not Congress has done so is a matter of Congressional intent. Choctaw Nation v. Oklahoma, 397 U.S. 620, 633, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

---

5. The Hellgate Treaty, 12 Stat. 975, was made with the Flathead, Kootenai and Upper Pend d' Oreilles Indians at Hellgate in the Bitterroot Valley on July 16, 1855. It was ratified by the Senate on March 8, 1859 and proclaimed by President James Buchanan on April 18, 1859. Article III of the Treaty reads:

> "The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gather-Rights and privileges of Indians ing roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

6. Other facts will be discussed in considering defendant's contention that any violation of § 1165 was not done "willfully and knowingly".

7. United States v. 5,677.94 Acres of Land, etc., 162 F.Supp. 108, 116 (D.Mont.1958); Seifert v. Udall, 280 F.Supp. 443, 444 (D.Mont. 1968); Dillon v. Antler Land Company, 341 F.Supp. 734, 741 (D.Mont.1972). Montana Power Company v. F.P.C., 148 U.S.App.D.C. 74, 459 F.2d 863, 865 (1972) states, without citation, "The Tribes (Confederated Salish and Kootenai) also own one half of the land of the reservoir, known as the Flathead Lake."

The defendant relies upon United States v. Holt State Bank, 270 U.S. 49, 57–58, 46 S.Ct. 197, 70 L.Ed. 465 (1926) which found that the title to the bed of Mud Lake, a navigable waterway within the Red Lake Reservation, had not been granted by treaty or by Act of Congress to the Chippewa Indians, and so title passed to the state of Minnesota upon her entry into the Union. The Court recognized, however, that where the intent is clear (and it may not lightly be inferred) the United States may by treaty or Act of Congress grant Indians title in river beds. In other words, *Holt* did not involve the express treaty provisions [8] which *Rochester* found determinative with respect to the ownership of the bed of the south half of Flathead Lake. *Rochester* must be held to be controlling in this case.

### Sufficiency of the Information

The defendant argues that the information fails to charge an offense containing the essential elements of the statutory crime; charges a factual impossibility in designating certain lands in the bottom of Flathead Lake as having been trespassed upon by the defendant; and erroneously charges that the part of Flathead Lake described as a part of the Flathead Indian Reservation is land within the meaning of 18 U.S.C. § 1165.

### Elements of the Crime

It is true that an information must expressly set forth the elements of the offense. It is also true that an essential element of this offense is a trespass upon land. State ex rel. Nepstad v. Danielson, 149 Mont. 438, 441, 427 P.2d 689 (1967).[9]

### "Land"

The defendant argues that the surface of Flathead Lake is not "land" within the meaning of 18 U.S.C. § 1165, so as to give reasonable notice of what constitutes criminal conduct.

Section 1165 makes it criminal to trespass "upon any land that belongs to any Indian or Indian tribe * * * or upon any lands * * * reserved for Indian use, for the purpose of * * * fishing * * *." Land "includes not only the soil or earth, but also things of a permanent nature affixed thereto or found therein, whether by nature, as water * * *. It embraces not only the surface of the earth, but everything under or over it. * * * It has in its legal signification an indefinite extent upward and downward." Black's Law Dictionary (Revised 4th Ed. 1968).

---

8. With respect to the treaty provisions in *Holt*, the Court said:

"There was no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of the Indians therein, nor any attempted exclusion of others from the use of navigable waters. The effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory; and thus it came to be known and recognized as a reservation. Minnesota v. Hitchcock, 185 U.S. 373, 389 [, 22 S.Ct. 650, 46 L.Ed. 954]. There was nothing in this which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy, before stated, of treating such lands as held for the benefit of the future State." 270 U.S. at 58–59, 46 S.Ct. at 200.

In a note the Court recognized that, "Other reservations for particular bands were specially set apart * * *." 270 U.S. at 58, 46 S. Ct. at 200.

9. In holding that 18 U.S.C. § 1165 "does not conflict with fish and game regulation by the State of Montana", the court said in part:

"*It is significant to note that section 1165 does not directly prohibit hunting and fishing but makes the act of going upon the Indian reservation a violation if done for the purpose of hunting or fishing.* Section 1165 expressly permits hunting and fishing on Indian reservations without additional federal regulation if proper permission or authorization is given for the entry. Therefore, section 1165 must be considered to be a statute providing a penalty for trespass to an Indian reservation and not an attempt by Congress to enter the field of fish and game regulation." (Emphasis in original) 427 P.2d at 691.

■ Whether "land" is taken to mean the submerged soil beneath Flathead Lake, or to include the water surface itself, trespass upon Indian land for the purpose of fishing is not ambiguous language, and clearly includes fishing from a boat on the southern one-half of Flathead Lake.

### Regulation of Navigable Waters

The defendant argues that the public's dominant right to use navigable waters is not overcome by 18 U.S.C. § 1165, and precludes a right to exclude, regardless of the ownership of the bed of a navigable waterway.[10]

■ It is clear that the federal government, under the Commerce Clause of the Constitution, has general dominion, to the exclusion of the states, over navigable waters. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 334, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958). It is just as clear that the states have authority to regulate fishing on navigable waters within their borders or coastal waters within their jurisdiction. C. J. Hendry Co. v. Moore, 318 U.S. 133, 135, 63 S.Ct. 499, 87 L.Ed. 663 (1943), rehearing denied, 318 U.S. 801, 63 S.Ct. 848, 87 L.Ed. 1165, and cases cited therein; and that these rights are not in conflict so long as interstate commerce is unaffected. Manchester v. Commonwealth of Massachusetts, 139 U.S. 240, 11 S.Ct 559, 35 L.Ed. 159 (1891).

In Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 785, 182 Ct.Cl. 130 (1968) it was held:

"An Indian tribe might exclude non-Indians from fishing in navigable waterways which are within its reservation if the grant of the reservation includes, as a part of that grant, the right to fish in designated areas free from interference. Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Moore v. United States, 157 F.2d 760 (9th Cir. 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947); Metlakatla Indian Community v. Egan, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962); Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487 (1964), cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L. Ed.2d 544. This is based on the implied or explicit grant of a right to fish undisturbed in accustomed aboriginal places."

The United States Supreme Court has twice dealt with the fishing rights of the Metlakatla Indians, and has twice "upheld the right of the Metlakatlans to exclude others" from the navigable waters surrounding their island. *Metlakatla Indian Community, supra,* 369 U.S. at 49, 56, 82 S.Ct. at 556; *Alaska Pacific Fisheries, supra.*

And the Ninth Circuit has concluded: "The fact that navigable waters are a part of a reservation held in trust for the Indian fisheries does not conflict with the trust also to hold them for the public for navigation." Moore v. United States, 157 F.2d 760, 765 (9 Cir. 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277.

Finally, fishing and hunting rights have been held set aside for the exclusive use of Indians as a part of land "[r]eserved for the use and occupation of the tribes and bands * * * and set apart for their exclusive use" even without express mention of hunting or fishing rights. Mason v. Sams, 5 F.2d 255, 257 (W.D.Wash.1925).

The Hellgate Treaty, *supra,* does expressly reserve to the Confederated Tribes "the exclusive right of taking

---

10. The Solicitor General has reached a contrary conclusion interpreting *Holt State Bank,* finding that the Chippewa Indians retained exclusive fishing rights on Red Lake, even without ownership of the bed; "[T]he Court [United States Supreme Court in *Holt State Bank*] had in mind rights of naviga-tion of a public nature and not private rights of ownership such as the Indian right of fishing. The latter was not involved and was neither considered nor discussed." Opinion Acting Sol. M 28107, June 30, 1936 quoted at Federal Indian Law, U.S. Dept. of Interior, 1958 Ed., 497–498.

fish in all the streams running through or bordering" the reservation, "as also the right of taking fish at all usual and accustomed places", in common with others, on ceded lands;[11] as well as setting aside the reservation itself "for the exclusive use and benefit" of the Confederated Tribes.[12] Moreover, in interpreting Indian treaties, the Supreme Court has consistently followed the general rule that "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930).[13]

■ The Confederated Salish and Kootenai Tribes have the authority granted them by treaty to the exclusive fishing rights on the southern one-half of Flathead Lake, a right that includes the right to exclude others from fishing, and one that is not in conflict with the public right to use the surface for navigation.[14]

### Constitutionality of § 1165

■ In addition to arguing that trespass on Indian land for the purpose of fishing is insufficient notice that fishing on Flathead Lake is prohibited, defendant argues that the statute provides no "fixed standard" by which "lawful authority or permission" can be measured and provides no delegation of authority to any agency or department to issue appropriate regulations, and so fails to provide a person of ordinary intelligence with fair notice that his conduct is forbidden.

In Quechan Tribe of Indians v. Rowe, 350 F.Supp. 106, 110 (S.D.Cal.1972) it was held that, "[I]f the Indians can show that some federal treaty, agreement, or statute authorizes them to adopt rules and regulations governing the 'control, licensing, or regulation' of hunting, trapping, and fishing, then those Indian laws are valid, and take precedence over conflicting state laws."

In *Quechan* that federal authority was granted by treaty and was confirmed in the Indian Reorganization Act of 1934, 25 U.S.C. § 461 et seq.; 18 U.S.C. § 1162(b) and 18 U.S.C. § 1165. The court found that § 1165 expressly "makes it a crime for any person to enter an Indian Reservation for the purpose of hunting, fishing, or trapping unless such person has tribal permission to do so." 350 F.Supp. at 110.

Here, as in *Quechan*, the Confederated Tribes had federal authority by treaty and statute to adopt rules and regulations governing the control, licensing and regulation of fishing, and it is that authority that provides substance to the clear intent of 18 U.S.C. § 1165 that "lawful authority or permission" must come from the tribe.[15]

---

11. Hellgate Treaty, *supra*, Art. III.

12. Hellgate Treaty, *supra*, Art. II.

13. This rule was most recently quoted with approval in McClanahan v. Arizona Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129, 137 (1973).

14. Moreover, the rights of Indian tribes to lands under navigable waters were recognized and confirmed in the Submerged Lands Act, enacted in 1953. Under 43 U.S.C. § 1311 Congress relinquished to the States all right, title, and interest of the United States to all lands beneath navigable waters within the borders of the respective States. Section 1313, however, excerpts from the operation of Section 1311

"(b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians;"

15. It is clear from the legislative history of § 1165 that it was the intent of Congress that permission be granted by the Indian owners. S.Rep.1686, 86th Cong. 2 Sess. reads in part:

"The problem confronting Indian tribes with sizable reservations is that the United States provides no protecton against trespassers comparable to the protection it gives to Federal property as exemplified by title 18, United States Code, section 1863 [trespass on national forest lands]. Indian property owners should have the same protection as other property owners. For example, a private hunting club may keep nonmembers off its game lands or it

It is 18 U.S.C. § 1165 rather than the ordinance of the Confederated Tribes which defines criminal conduct. The Tribes' regulation, control and licensing of fishing is within the authority granted them by treaty and recognized by statute. Their exercise of that authority does not violate the defendant's right to due process of law.

### Effect of Public Law 280

In his reply brief defendant suggests that prosecution under 18 U.S.C. § 1165 has been superseded by the assumption of state jurisdiction pursuant to Public Law 280 (Act of August 15, 1953, 67 Stat. 588, 590). Public Law 280 prescribes a procedure whereby states may acquire both civil and criminal jurisdiction over Indians on Indian reservations. Under §§ 83–801 to 83–806, R.C.M.1947 and Ordinance 40–A of the Tribal Council of the Confederated Tribes, the State of Montana now has jurisdiction with respect to specified civil actions and criminal laws. See discussion in State ex rel. McDonald v. District Court, 159 Mont. 156, 496 P.2d 78 (1972).

Section 2 of Public Law 280, however, expressly provides that:

"Nothing in this section * * * shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." 18 U.S.C. § 1162(b).

### Civil Rights

The defendant also argues that Title II of the Civil Rights Act of 1968, 25 U.S.C. § 1301 et seq., which prohibits a tribe's exercise of its power of self government to "deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law" prohibits "any attempt on the part of the tribes to use the criminal law as a basis for carrying out discriminatory practices against the defendant."

The defendant argues further that "the only substantive basis for charging the defendant has its foundation and roots in the fact that he may not be an Indian or a member of the Confederated Salish and Kootenai Tribes" and that "a conviction founded thereupon would be nothing less than a conviction based upon racial distinctions."

The information charges, and the statute makes criminal, trespass on Indian land for the purpose of fishing without lawful authority or permission.[16] Any person can escape prosecution by obtaining "lawful permission or authority", as provided in Tribal Ordinance 44A. That Ordinance provides for fee recreational permits to be issued for fishing on the reservation to all persons not members of the Confederated Salish and Kootenai Tribes. It also provides that free recreational permits shall be issued to tribal members.

These rights are based upon treaty and exercised pursuant to statute. They do not discriminate on the basis of race, nor do they deprive the defendant of any civil right.

### Validity of Tribal Ordinance 44A

In his supplemental motion to dismiss defendant contends that Tribal Ordinance 44A (Revised) is invalid, and that any attempt to enforce it through 18 U.S.C. § 1165 is contrary to his due process rights and Title II of the Civil Rights Act of 1968, 25 U.S.C. § 1301 et seq. Defendant argues that the Ordi-

---

may issue a permit for a fee. One who comes on such lands without permission may be prosecuted under State law but a non-Indian trespasser on an Indian reservation enjoys immunity. This is by reason of the fact that Indian tribal law is enforcible against Indians only; not against non-Indians."

16. As noted *supra*, it was the intent of Congres in enacting § 1165 to give Indian owners the same protection against trespassing as other property owners. In the absence of the statute non-Indians would be immune from prosecution, although Indian trespassers could be prosecuted in tribal courts.

nance was not promulgated in accordance with Article VI, Section 1(i) of the Constitution of the Confederated Tribes and that it is in conflict with the Treaty of the Upper Missouri.

Article VI, Section 1(i) of the Confederated Tribes' Constitution provides that the Tribal Council has the power:

"(i) To promulgate and enforce ordinances, subject to review by the Secretary of the Interior, which would provide for assessments or license fees upon non-members doing business within the reservation, or obtaining special rights or privileges, and the same may also be applied to members of the Confederated Tribes, provided such ordinances have been approved by a referendum of the Confederated Tribes."

Defendant concedes that the Ordinance's fee permit system granting fishing rights to non-members falls within the "special rights or privileges" provision of subdivision (i), but he contends the Ordinance is invalid because not "approved by a referendum of the Confederated Tribes". It is clear, however, that the Tribes' Constitution requires approval by a tribal referendum only when the assessment or license fee is "applied to members of the Confederated Tribes". Since Ordinance 44A (Revised) applies only to non-members, it was unnecessary to obtain approval by a referendum of the Tribes. The Ordinance was approved by the Secretary of the Interior.

The defendant next urges that the Ordinance, insofar as it requires a fee permit for boating by non-members on the south half of Flathead Lake, is in conflict with Article VIII of the Treaty of the Upper Missouri, 11 Stat. 657, 659, October 17, 1855, which provides that "the navigation of all lakes and streams shall be forever free to citizens of the United States." As stated in the order of July 9, 1973, "this case is concerned solely with an alleged violation of 18 U.S.C. § 1165 and is limited to fishing on the South Half of Flathead Lake". Section 1165 relates only to fishing, hunting, or trapping without a permit. It is unnecessary to consider or determine whether the Ordinance is valid in its requirement of a fee permit for boating and other recreational activities.

### Did Defendant Act "Willfully and Knowingly"?

Finally, defendant contends that under the agreed facts, the Government has failed to prove that he acted "willfully and knowingly", an essential element of the offense charged.

The parties have stipulated:

"That prior to June 1, 1972, Defendant discussed with his attorney, whom he believed to be competent to advise on the legal matters involved, the question of whether he as a non-Indian had the right to fish on the waters of the South half of Flathead Lake without a tribal permit. That following discussion and disclosure of all relevant facts and matters, * * * the Defendant, acting on the basis of his attorney's advice did the act * * * [complained of] with the belief and understanding that said act was not in violation of 18 U.S.C. 1165."[17]

It is true, as defendant argues, that his "contemplated action involved substantial legal problems". While the legal questions have now been resolved contrary to defendant's contentions, it is stipulated that in acting as he did defendant was relying on the advice of competent counsel, who was thoroughly familiar with all of the applicable facts and legal problems presented.

---

17. 18 U.S.C. § 1165 makes it an offense to "willfully and knowingly" go "upon any land that belongs to any Indian or Indian Tribe" without the required permit. Acting on the advice of counsel, defendant believed, inter alia, that where he was fishing was not "land" within the meaning of § 1165 and that the waters of the south half of Flathead Lake were not within the exclusive control of the Tribe, particularly in view of the fact that navigable waters are public ways under both state and federal laws—§ 89–501, R.C.M.1947 and 43 U.S.C. § 931.

█ As the defendant correctly points out, one cannot be found guilty of a willful violation of the law if, before taking any action, he seeks the advice of an attorney in good faith and for the purpose of securing advice about the lawfulness of his possible future conduct, makes an accurate report to his attorney of all the material facts, and acts strictly in accordance with the advice of his attorney. Williamson v. United States, 207 U.S. 425, 453, 28 S. Ct. 163, 52 L.Ed. 278 (1908);[18] United States v. Interstate Engineering Corporation, 288 F.Supp. 402, 416 (D.N.H. 1967); Tarvestad v. United States, 418 F.2d 1043, 1047 (8 Cir. 1969), cert. denied, 397 U.S. 935, 90 S.Ct. 944, 25 L. Ed.2d 116 (1970); Devitt and Blackmar, Federal Jury Practice and Instructions, Section 16.15.

█ It is agreed that this is a test case. Defendant went fishing on the south half of Flathead Lake believing that his act was lawful, but knowing that it would be a violation of 18 U.S.C. § 1165 if that statute were held applicable. It may be argued that in doing so he waived any right to rely on the advice of counsel as a defense. Although I recognize that acting on the advice of counsel is not always a defense to a charge of "willfulness", I cannot escape the conclusion that under the particular facts of this case, involving as it does a substantial legal problem, defendant's reliance on counsel's advice precludes a finding that his violation of the law was "willful".[19] While defendant was thoroughly familiar with the legal problems involved in his act, he honestly believed on the advice of competent counsel that his act was lawful and was not in violation of § 1165.[20]

The court finds the defendant not guilty by reason of the failure of the Government to prove that defendant acted "willfully and knowingly" in fishing upon the south half of Flathead Lake without lawful authority or permission, in violation of 18 U.S.C. § 1165.

The court adheres, however, to its opinion of March 16, 1973 that fishing by a non-member of the Tribes on the south half of Flathead Lake without a permit from the Tribes is a violation of 18 U.S. C. § 1165. Without attempting to prejudge any case involving a violation of the statute, it is noted that with respect to any person violating § 1165, in the same manner as did the defendant, subsequent to the order of March 16, 1973, the defense that the act was not done "willfully and knowingly" may not be recognized by the court.[21]

---

18. In *Williamson* the Court approved the following instruction:

"Having now placed before you the timber and stone law, and what it denounces, and what it permits, if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do in the matter of loaning money to applicants under it, and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves wilful and unlawful intent; even if such advice were an inaccurate construction of the law. But, on the other hand, no man can wilfully and knowingly violate the law, and excuse himself from the consequences thereof by pleading that he followed the advice of counsel." 207 U.S. at 453, 28 S.Ct. at 173.

19. This is not a case where the statute specifically prohibited the act committed by the defendant. Prior to the decision in this case, there was a substantial legal question as to whether § 1165 was applicable to fishing on the south half of Flathead Lake.

20. Defendant also relies on a cooperative agreement between the Tribes and the Montana Fish and Game Commission dated September 5, 1969 wherein the Tribal Council agreed not to require a trespass permit for fishing on designated areas, including Flathead Lake. This agreement, however, expired under its terms on April 30, 1970. There is no evidence that it was renewed or effective after that date.

21. If the parties (and the Tribes) desire appellate review of the court's conclusions on the other issues (aside from whether defendant's act was "willful"), they may wish to consider (1) prosecution of one who violated 18 U.S.C. § 1165 subsequent to March 16, 1973, or (2) whether an action for a declaratory judgment would be proper for this purpose.