**UNITED STATES of America,**
**Plaintiff,**

v.

**James Junior FINCH, Defendant.**
**No. CR–74–25–BLG.**

United States District Court,
D. Montana,
Billings Division.

April 9, 1975.

Otis L. Packwood, U. S. Atty. for the District of Montana, Billings, Mont., for plaintiff.

Robert W. Holmstrom, Billings, Mont., for defendant.

Cate, Lynaugh, Fitzgerald & Huss, Billings, Mont., for amicus curiae Crow Tribe of Indians.

Clayton L. Herron, Helena, Mont., for amicus curiae Montana Fish and Game Commission.

## MEMORANDUM OPINION AND ORDER

BATTIN, District Judge.

The information filed herein on May 16, 1974, charges:

"That on or about May 5, 1974, in the District of Montana, JAMES JUNIOR FINCH, within the exterior boundaries of the Crow Indian Reservation, did without lawful authority or permission and for the purpose of fishing thereon, unlawfully and knowingly go upon land identified as located in Section 8, Township 5 South, Range 32 East, M.P.M., Big Horn County, Montana, being a portion of the Big Horn River. The said JAMES JUNIOR FINCH was standing upon land belonging to the State of Montana for the benefit and use of its State Fish and Game Commission, while fishing in said Big Horn River, said river being Indian trust land, closed to hunting and fishing to all non-Crow citizens, all contrary to the provisions of 18 U.S.C. 1165."

On June 14, 1974, the defendant filed a motion to dismiss said information. The parties submitted extensive and well-considered memoranda of law. On September 4, 1974, an order was filed wherein I denied the motion to dismiss and noted that the information was sufficient on its face. An Agreed Statement of Facts and additional memoranda of law have been filed. Additionally, counsel for the Crow Tribe of Indians and the State of Montana, Department of Fish and Game, have appeared herein as *amici curiae*.

After a thorough review of the file, I am compelled to reconsider my order dated September 4, 1974, wherein I denied defendant's motion to dismiss. I conclude that the information is not sufficient on its face for several reasons.

First, the defendant is charged with a violation of 18 U.S.C.A. § 1165, which reads as follows:

"Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited."

An essential element to the offense charged against the defendant herein and as defined by 18 U.S.C. § 1165 is that the defendant go upon "any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States."

I have previously held that the portion of the Big Horn River bed in question is held by the United States in trust for the Crow Tribe of Indians. Order of this Court dated September 4, 1974, in the case now at issue, and United States v. Haug and Mill, D.Mont., Billings Div., Misc.Crim. No. 511 (June 9, 1971) [see appendix]. After a further review of the pertinent treaties and the nature of the Tribe's title, I have concluded otherwise and by this memorandum opinion and order specifically overrule my holding in these two cases.

The title of the Crow Tribe to a large area (which now includes their present-day reservation) was recognized by the Treaty of Fort Laramie, signed in 1851. 11 Stat. 749, II Kapp. 594. Article 5 of that treaty reads in pertinent part:

"The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz:

\*　　\*　　\*　　\*　　\*　　\*

"The territory of the Crow Nation, commencing at the mouth of Powder River on the Yellowstone; thence up Powder River to its source; thence along the main range of the Black Hills and Wind River Mountains to the head-waters of the Yellowstone River; thence down the Yellowstone River to the mouth of Twenty-five Yard Creek; thence to the head waters of the Muscle-shell River; thence down the Muscle-shell River to its mouth; thence to the head-waters of Big Dry Creek, and thence to its mouth.

\*    \*    \*    \*    \*    \*

"It is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; and further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described."

The Treaty of Fort Laramie, 1851, involved some eight Indian Nations. The treaty's background has been thoroughly studied by the Courts and need not be exhaustively repeated here.[1] However, records reveal that

" \* \* \* the Government sought to initiate treaty negotiations primarily to promote peace among these tribes, to protect settlers and other travelers along the Platte and Arkansas Rivers, and to help establish responsibility for any depredations that might be committed in a particular area." Sioux Tribe v. United States, Ct.Cl., 500 F. 2d 458, 464 (1974).

The Treaty of Fort Laramie, 1851, did recognize the Crow Indian title to the land described therein. See Crow Tribe of Indians v. United States, 284 F.2d 361, 371, 151 Ct.Cl. 281 (1960).

However, a reservation was not established until the enactment of the Treaty with the Crow Indians, 1868. 15 Stat. 649. See United States v. Powers, 9 Cir., 94 F.2d 783, 785 (1938). Under this treaty, the territory for the Crows was significantly reduced. Article II of that treaty reads as follows:

"The United States agrees that the following district of country, to wit: commencing where the 107th degree of longitude west of Greenwich crosses the south boundary of Montana Territory; thence north along said 107th meridian to the mid-channel of the Yellowstone river; thence up said mid-channel of the Yellowstone to the point where it crosses the said southern boundary of Montana, being the 45th degree of north latitude; and thence east along said parallel of latitude to the place of beginning, shall be, and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no persons, except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle ·upon, or reside in the territory described in this article for the use of said Indians, and henceforth they will, and do hereby, relinquish all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the limits aforesaid."

These two treaties were amended by later Acts which further reduced the size of the Reservation. See 22 Stat. 42, 26 Stat. 989, 33 Stat. 352, and 50 Stat. 884.

The Treaty of Fort Laramie was enacted in 1851, long before the passage of

---

1. See Crow Tribe of Indians v. United States, 284 F.2d 361, 151 Ct.Cl. 281 (1960), and Sioux Tribe v. United States, Ct.Cl., 500 F.2d 458 (1974).

the Organic Act of the Territory of Montana in 1867. 14 Stat. 426.

Neither the Treaty of Fort Laramie of 1851 nor the Treaty with the Crow Indians of 1868 made specific reference as to the title of Big Horn River bed. It has been held that the Big Horn River is a navigable stream. See The Crow Tribe of Indians of Montana v. United States, D.Mont., Billings Div., Civil No. 214 (October 1, 1963). However, the general rule as to the disposal of beds of navigable streams is briefly stated in United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926):

> "  *   *   *   [T]he United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future States, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

The question presented to the Supreme Court in the *Holt State Bank* case was the title to the bed of Mud Lake, which was formerly a navigable body of water within the forum Red Lake Indian Reservation. The Court concluded that title to the bed of the lake passed to the State of Minnesota on its admission into the Union. The Supreme Court stated:

> "There was no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of the Indians therein, nor any attempted exclusion of others from the use of navigable waters. The effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory; and thus it came to be known and recognized as a reservation. Minnesota v. Hitchcock, 185 U.S. 373, 389 [22 S.Ct. 650, 46 L.Ed. 954]. There was nothing in this which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy, before stated, of treating such lands as held for the benefit of the future State." 270 U.S. 49, 58–59, 46 S.Ct. 197, 200, 70 L.Ed. 465.

This holding has not been reversed. However, the Supreme Court held in Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed. 615 (1970), that the Choctaw and Cherokee Indian Nations received title to land underlying a navigable portion of the Arkansas River. As the Court noted in Choctaw, the practical question was the ownership of minerals:

> "As a practical matter, what is at stake is the ownership of the minerals beneath the river bed and of the dry land created by navigable projects that are narrowing and deepening the river channel." 397 U.S. 620, 621, 90 S.Ct. 1328, 1329, 25 L.Ed.2d 615.

As is the case with the Crow Indians, a series of treaties was involved in the *Choctaw Nation* case. Unlike the Crow Indians, the Choctaw Indians were forced to leave their aboriginal lands and the United States promised to convey different land to the Choctaw Nation in fee simple. Patents were issued thereunder.

> "In addition, the United States pledged itself to secure to the Choctaws the 'jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation . . . and that no part of the land granted to them shall ever be embraced in any Territory or State.' Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333–334." 397 U.S.

620, 625, 90 S.Ct. 1328, 1332, 25 L. Ed.2d 615.

No such provision explicitly provides that Crow Lands were never to be embraced within any territory or state.

From the circumstances in the *Choctaw Nation* case, the Court concluded:

"Together, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers. To the extent that the documents speak to the question, they are consistent with and tend to confirm this natural reading." 397 U.S. 620, 634, 90 S.Ct. 1328, 1336, 25 L. Ed.2d 615.

■ I conclude from the above that the treaties involved in this case most closely approximate those in the *Holt State Bank* case and not those in the *Choctaw Nation*. It follows, therefore, that the information is insufficient on its face in that the defendant is charged with going upon a portion of the Big Horn River which is not "land that belongs to any Indian or Indian tribe, band or group" and further which is not held in trust or "is subject to a restriction against any alienation imposed by the United States"—an essential element to the offense defined in 18 U.S.C. § 1165.

■ Even were I to hold that the United States held the portion of the Big Horn River in question in trust for the Crow Tribe of Indians (which I explicitly do not so hold), I would be compelled to dismiss the information for yet another reason. The information charges that the defendant "was standing upon land belonging to the State of Montana for the benefit and use of its State Fish and Game Commission." As an owner of land adjacent to a navigable stream, the State of Montana has riparian rights. Following a long line of earlier cases, the Supreme Court in United States v. River Rouge Improvement Co.,

269 U.S. 411, 418, 46 S.Ct. 144, 146, 70 L.Ed. 339 (1926), stated:

"It is well settled that in the absence of a controlling local law otherwise limiting the rights of a riparian owner upon a navigable river, Shively v. Bowlby, 152 U.S. 1, 40 [4 S.Ct. 548, 38 L.Ed. 331], he [the riparian owner] has, in addition to the rights common to the public, a property right, incident to his ownership of the bank, *of access from the front of his land to the navigable part of the stream,* and when not forbidden by public law may construct landings, wharves or piers for this purpose." (Citations omitted, emphasis added.)

The State of Montana is not plaintiff herein and is not complaining of the defendant's use of its land to gain access to the Big Horn River for fishing purposes. In fact, the State of Montana as *amicus curiae* herein argues that the land was acquired for the defendant's benefit as a citizen and member of the public.

Citing United States v. Pollmann, D. C., 364 F.Supp. 995, the plaintiff argues that the casting of a fishing lure in or on that portion of the Big Horn River in question constitutes a violation of 18 U. S.C. § 1165. Such an argument ignores a substantial distinction between the *Pollmann* case and the instant action. In *Pollmann*, the defendant was fishing from a boat on the surface of the waters of the south half of Flathead Lake, the bed of which was (and is) held in trust for the Confederated Salish and Kootenai Indian Tribes. The defendant in the instant case was fishing from property of the State of Montana. Consequently, the plaintiff fails to establish an essential element of an offense under 18 U.S. C. § 1165—a trespass upon Indian land.

Still another essential element of the offense charged is that the defendant go upon land for the purpose of fishing "without lawful authority or permission." In support of this element, the plaintiff refers to a Crow Tribal Ordinance dated October 13, 1973, wherein

the Tribe prohibited non-Tribal members from fishing within the exterior boundaries of the Reservation. The validity of that ordinance rests upon the sovereignty of the Crow Tribe in that regard. As Judge Smith observed in the case of United States of America v. Blackfeet Indian Reservation, Civil No. 3197, in the United States District Court for the District of Montana, Great Falls Division:

> "The defendants urge that the Blackfeet Tribe is sovereign and that the jurisdiction of a tribal court flows directly from that sovereignty. No doubt the Indian tribes were at one time sovereign and even now the tribes are sometimes described as being sovereign. The blunt fact, however, is that an Indian tribe is sovereign to the extent that the United States permits it to be sovereign—neither more or less."

A review of the pertinent treaties is therefore necessary to determine the sovereignty of the Crow Tribe concerning fishing on the Reservation. The Treaty of Fort Laramie of 1851, 11 Stat. 749, provides in Article V that the Indian tribes mentioned in the treaty did not surrender their privileges of hunting and fishing by accepting the respective reservations but rather that they maintained such rights as well as the right to pass over any of the tracts of land described in the treaty for the purposes of hunting and fishing. The Treaty with the Crow Indians dated May 7, 1868, 15 Stat. 649, does not contain any reference to fishing.

■ The preservation of the Tribe's privilege of fishing does not grant the Tribe the exclusive right to fish. Such an exclusive right could be granted to the Tribe. See, for example, the Hellgate Treaty, 12 Stat. 975, with the Flathead, Kootenai and Upper Pend d'Oreilles Indians, Article III thereof, which reads:

> "*The exclusive right of taking fish* in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." [Emphasis added.]

Certainly the Tribes under such a treaty provision have sufficient sovereignty to regulate fishing by non-Tribal members on the reservation. See United States v. Pollmann, *supra.*

■■ The right of an Indian Tribe to exclude non-Tribal members from fishing in navigable water is not a novel question to the Courts. In the case of Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918), the Supreme Court noted that a reservation had been created for the Metlakahtlan Indians consisting of the Annette islands. The Court stated:

> "The principal question for decision is whether the reservation created by the Act of 1891 embraces only the upland of the islands, or includes as well the adjacent waters and submerged land. The question is one of construction,—of determining what Congress intended by the words 'the body of lands known as Annette islands.'" 248 U.S. at 87, 39 S.Ct. at 41.

The Court then reviewed the history of the creation of the reservation and its purposes, and the opinion contains the following statement of fact:

> "The islands are in the interior of the Alexander archipelago and separated from other islands by well-known bodies of water. Before the Metlakahtla settlement they were wild and uninhabited. While bearing a fair supply of timber, only a small portion of the upland is arable, more than three-fourths consisting of mountains and rocks. Salmon and other fish in large numbers frequent and pass through the waters adjacent to the shore, and the opportunity thus

**212**

afforded for securing fish for local consumption and for salting, curing, canning and sale gives to the islands a value for settlement and inhabitance which otherwise they would not have." 248 U.S. at 88, 39 S.Ct. at 41.

Based upon these facts, the Court concluded as follows:

"The circumstances which we have recited shed much light on what Congress intended by 'the body of lands known as Annette islands.' The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation. They had done much for themselves and were striving to do more. Evidently Congress intended to conform its action to their situation and needs. It did not reserve merely the site of their village, or the island on which they were dwelling, but the whole of what is known as Annette islands, and referred to it as a single body of lands. This, as we think, shows that the geographical name was used, as is sometimes done, in a sense embracing the intervening and surrounding waters as well as the upland,—in other words, as descriptive of the area comprising the islands." 248 U.S. at 89, 39 S.Ct. at 42.

In view of the Court's determination that Congress intended the surrounding waters to be included within the Annette islands, the Court rules that the plaintiff could not have its salmon trap located in the navigable water because it was within the boundaries of the reservation.

Again in considering the *Alaskan Pacific Fisheries* case, I note that the Indians in question were fishermen and that the lands given to them for their reservation had value only for fishing purposes. The rule was stated in the case of Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968), as follows:

"An Indian tribe might exclude non-Indians from fishing in navigable waterways which are within its reservation if the grant of the reservation includes, as a part of that grant, the right to fish in designated areas free from interference. [Citations omitted.] This is based on the implied or explicit grant of a right to fish undisturbed in accustomed aboriginal places." 389 F.2d at 785.

In the instant case, plaintiff has failed to show that the Crows were fishermen or that they historically derived their food supply from fishing. Nor does the 1868 Treaty contain any reference to fishing. The Court is well aware of the maxims to be applied in the interpretation of treaties with Indian tribes.[2] However, when the treaties do not expressly create an exclusive right to fish and when the treaties cannot reasonably be construed by implication to create such a right, it is beyond the power of the Court, even when applying such maxims, to create such a right. None simply exists. As noted by Judge Jameson in the case of Confederated Salish and Kootenai Tribes, et al. v. Namen, et al., Civil No. 2343, U.S.D.C., District of Montana, Missoula Division:

"In the complex, and sometimes uncertain area of Indian law, care must be exercised in attempting to apply language used in one factual situation to a totally different context."

---

2. Treaties with the Indians must be interpreted as the Indians would have understood them. Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). Doubtful expressions are to be resolved in favor of the Indian parties to the Treaty. McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 174, 93 S. Ct. 1257, 36 L.Ed.2d 129 (1973); Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930). Indian treaties are to be construed in favor of the Indians. Choctaw Nation of Indians v. United States, 318 U.S. 423, 431–32, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

The Court therefore concludes that the Crow Tribal Ordinance dated October 13, 1973, is invalid insofar as it attempts to prohibit fishing on non-Indian land located within the exterior boundaries of the reservation.[3]

█ For the reason that the bed of the Big Horn River is not held by the United States in trust for the Crow Tribe of Indians, and for the reason that even if said river bed were held in trust for the Crow Indians the defendant is not charged with going upon said bed, and for the reason that the Crow Indians lack sufficient sovereignty to prohibit fishing from non-Indian land located within the exterior boundaries of the reservation, the Court concludes that the information on file herein does not state an offense against the United States.

It is therefore ordered that said information be dismissed.

### APPENDIX

United States of America, Plaintiff,

v.

Larry Haug and Thomas Jack Mill, Defendants.

Misc. Crim. No. 511.

United States District Court, D. Montana, Billings Division.

June 10, 1971.

Keith L. Burrowes, Asst. U. S. Atty., Billings, Mont., for plaintiff.

Charles F. Moses, Billings, Mont., for defendants.

Clayton L. Herron, Helena, Mont., for amicus curiae Montana Fish and Game Commission.

James E. Torske, Stanton, Hovland & Torske, Hardin, Mont., for amicus curiae Crow Tribe of Indians.

3. None of the parties herein, nor any of the *amici curiae* who have appeared herein, attack the constitutionality of 18 U.S.C. § 1165. In fact, there can be little doubt that said statute is valid.

1. See Fort Laramie Treaty of September 17, 1851 (11 Stat. 749), and Fort Laramie Treaty of May 7, 1868 (15 Stat. 649). It should be noted that these treaties were

### MEMORANDUM OPINION AND ORDER

BATTIN, District Judge.

The Commissioner's complaint in this matter charges that the defendants "did knowingly, wilfully and unlawfully fish upon Crow Tribal Allotted land within the exterior boundaries of the Crow Indian Reservation without first obtaining a permit." Defendants have filed a motion to dismiss the complaint. The complaint is based on Title 18 U.S.C., Section 1165, which provides in pertinent part:

"Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe . . . for the purpose of . . . fishing thereon . . . shall be fined not more than $200 or imprisoned not more than ninety days, or both . . . ."

The body of water in question is the Big Horn River from the mouth of Soap Creek to a point three or four miles downstream. The area is downstream from Yellowtail Dam.

The initial question for decision is whether the land under the river, comprising the banks of the river, and forming islands in the river in the area in question is land belonging to the Crow Tribe. Maps are attached to this opinion showing the Big Horn River in relation to the Crow Reservation and the different sizes of the Reservation at different times. Since its formation, the Crow Reservation has encompassed the portion of the Big Horn River in question. It should be noted that the Reservation as it exists today belongs to the Crow Tribe by virtue of aboriginal title rather than by an express grant in a treaty.[1] The various treaties with the

made before Montana was admitted to the Union. This court has previously recognized that these treaties are ones "confirming the aboriginal title of the Indians and providing that certain lands of the Crow Indians were set aside for their absolute and undisturbed use and occupation." United States v. 5,677.94 Acres of Land, 162 F.Supp. 108, 110 (D.Mont.1958).

Crow Tribe have served to decrease the size of the Reservation, rather than to enlarge it or to grant a new area.

In Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), the United States Supreme Court recently held that the Choctaw Nation received title to land underlying a navigable portion of the Arkansas River. At stake were mineral rights. The land surrounding the segment of the Arkansas River in question was granted to the Indians in fee simple by the United States. The Court stated at 397 U.S. 634, 90 S.Ct. at 1336:

> "Together, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants, is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers."

To attempt to distinguish *Choctaw Nation* on the ground that it involved fee simple title whereas the present case involves aboriginal title, is to argue a distinction without a difference. In both instances the area is described by metes and bounds which traverse a river. And the right held by the tribes in both instances includes the absolute right of use over the area described. In its many treaties with the Crow Indians, the United States did not reserve any right to the river bed or to the land within the high water mark. Considering that the treaties were not arm's-length transactions, such a reservation could have been expressly made if it was intended, and the failure to include a reservation must be construed in favor of the Indians. Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).

Defendants contend that "private ownership ends where navigability begins."[2] This proposition does not mean, however, that private title to the bed and banks of the river ends where navigability begins. Bohn v. Albertson, 107 Cal.App.2d 738, 238 P.2d 128 (1951). Considering *Choctaw Nation*, the treaties involved in this case, and the nature of the Crow Tribe's title, the conclusion is inescapable that the riverbed, the islands, and the river banks of the portion of the Big Horn River in question belong to the Crow Tribe.

Defendants further contend that the right to fish upon a navigable river is not affected by the ownership of the riverbed. The Montana Fish and Game Department, appearing as *amicus curiae*, contends that where a river has been declared navigable, fishermen may properly fish within the confines of the river as it courses through tribal lands. It is not necessary to reach either of these questions at this stage of the proceeding. The question here is the sufficiency of the complaint.

Title 18 U.S.C., Section 1165, defines an offense against the United States over which this court has jurisdiction. Within the wording of the statute, the complaint charges defendants with unlawfully fishing upon Crow Tribal land. The complaint is sufficient on its face.

On a pre-trial motion to dismiss the complaint, it is not the function of the court to hypothesize various factual situations which may arise in the trial of the case. Many of the issues raised in the briefs are predicated on a showing that defendants, while within the Reservation, stayed only on the water of the Big Horn River. Such issues are more properly determined by proper motion at trial.

It is therefore ordered that defendants' motion to dismiss the complaint is denied.

It is further ordered that the time for arraignment of defendants is hereby set

---

2. The portion of the Big Horn River in question was held to be a navigable river in The Crow Tribe v. United States, D.Mont.,

Billings Div., Civil No. 214 (October 1, 1963).

for 9:00 o'clock a. m., Wednesday, June 23, 1971.

Done and dated this 9th day of June, 1971.

**CROW INDIAN RESERVATION**
**MONTANA - WYOMING**

AS ESTABLISHED BY TREATY OF SEPTEMBER 17, 1851

CHART 1

2-27-47

# CROW INDIAN RESERVATION
## MONTANA
### AS ESTABLISHED BY TREATY OF MAY 7, 1868

CHART 2

2 - 27 - 47

EASTERN BOUNDARY OF CESSION OF 1882 AS ERRONEOUSLY INDICATED ON ROYCE' MAP.

CEDED

# CROW INDIAN RESERVATION
## MONTANA
### AFTER THE ACT OF CONGRESS OF APRIL 11, 1882
### (22 STAT. 42)

### CHART 3

2-27-47

218

CROW INDIAN RESERVATION
MONTANA
AFTER THE ACT OF CONGRESS OF MARCH 3, 1891
(26 STAT. 989)
CHART 4

2-27-47

# CROW INDIAN RESERVATION
## MONTANA
### AFTER THE ACT OF CONGRESS OF APRIL 27, 1904
### (33 STAT. 352)

### CHART 5

2-27-47

CROW INDIAN RESERVATION
MONTANA
AFTER THE ACT OF CONGRESS OF AUGUST 31, 1937
(50 STAT. 884)

CHART 6

2-27-47